UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ERIC RITTER,
SPIROCHAETE RESEARCH LABS LLC,
Plaintiffs,

v.

TAMARA RUBIN,
LEAD SAFE MAMA LLC,
Defendants.

No. _____

COMPLAINT

JURY TRIAL DEMANDED

---

COMPLAINT

Plaintiffs, Eric Ritter and Spirochaete Research Labs LLC, by and through undersigned attorneys, make this complaint against Defendants Tamara Rubin and Lead Safe Mama LLC, and assert as follows:

1. Pursuant to a contract, Defendants received $90,000 from Plaintiffs and in return Defendants promised to provide one year of advertising on a header banner spot. Defendants never provided **any of the advertising** and refuse to refund the money to Plaintiffs despite the contractual obligation to do so.

2. In other contract agreements, Defendants received $30,488 from Plaintiffs in return for other products/services. Defendants failed to provide those products/services in full and the products/services provided did not provide anything of value to Plaintiffs.

3. Defendants fraudulently induced Plaintiffs to pay money with a promise to provide advertising knowing that Defendants would not provide the advertising and would not refund the payments. Defendants received unjust enrichment from Plaintiffs.

PARTIES, JURISDICTION AND VENUE

4. Plaintiff ERIC RITTER is a citizen of New York and an adult individual domiciled in New York, living at the address 690 Rte 25a, Suite 3, East Setauket, New York 11733.

5. Plaintiff SPIROCHAETE RESEARCH LABS, LLC is a limited liability company and a citizen of New York with a principal place of business at 690 Rte 25a, Suite 3, East Setauket, New York 11733; and it has been incorporated by the State of New York. SPIROCHAETE RESEARCH LABS, LLC has a registered DBA for Scitus Lab Products. At times Plaintiff SPIROCHAETE RESEARCH LABS, LLC uses Scitus Lab Products in its conduct of business.

6. Defendant TAMARA RUBIN is a citizen of Oregon and an adult individual domiciled in Oregon, living at the address 7933 SE 15th Ave., Portland, Oregon 09702.

5. Defendant LEAD SAFE MAMA LLC is a limited liability company and a citizen of Oregon with a principal place of business at 7933 SE 15th Ave., Portland, Oregon 09702; and it has been incorporated by the State of Oregon.

6. This court has jurisdiction under 28 U.S.C § 1332 in that the adverse claimants are of diverse citizenship and the amount in controversy exceeds $75,000.00.

7. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this district. Defendants contacted Plaintiffs in New York and Defendants entered into contracts with Plaintiffs in New York. Defendants promised to deliver products/services to Plaintiffs located in New York. Defendants knew that their acts would cause damages to Plaintiffs in New York.

8. Venue is also proper in this court because one or more of the Parties reside in this judicial district.

COUNT I- BREACH OF CONTRACT

9. The averments above are incorporated herein by reference.

10. Plaintiffs and Defendants entered into an agreement that Plaintiffs would pay $90,000 to Defendants and Defendants promised to provide one year of advertising on a header banner spot. Attached as Exhibit A is a copy of a contract between Plaintiffs and Defendants ("Contract").

11. Defendants never provided any of the advertising and refuse to refund the money to Plaintiffs despite the contractual obligation to do so.

12. The Contract has a "Refund Agreement" that provides:

> Should, at any time on or after November 1, 2023, Advertiser determine their product is not going to meet condition #2 above, Lead Safe Mama, LLC will refund the $90,000 paid with this invoice, at a rate of $10,000 per month (without interest) until the $90,000 is repaid in full. The first $10,000 payment will be made 30 days after written notice is given that the product will not meet this condition.

13. On June 6, 2024 and June 24, 2024, Plaintiffs gave Defendants written notice that the product would not meet condition #2. Copies of those notices are attached as Exhibit B and Exhibit C.

14. Defendants have the contractual duty to pay Plaintiffs $90,000. Defendants breached that duty and caused Plaintiffs damages of $90,000 plus lost profits that Plaintiffs would have earned it they had use of the $90,000.

15. Defendants also had the implied contractual duty to act in good faith and fair dealing. Defendants breached that duty and caused Plaintiffs damages of $90,000 plus lost profits that Plaintiffs would have earned it they had use of the $90,000. The averments in Count III below are incorporated herein by reference. Those averments further establish Defendants' breach of the duty to act in good faith and with fair dealing.

16. In the Contract in Terms and Conditions #5, the parties agreed that Defendants would provide the exclusive right to advertise "glowing test" for 3 years; and Defendants would not allow anyone else to advertise a similar or competing product. Defendants breached that agreement and said Defendants would not advertise glowing test because Defendants incorrectly believed that use of glowing test violated a patent owned by a third party.

## COUNT II- BREACH OF CONTRACT

17. The averments above are incorporated herein by reference.

18. In addition to the Contract referred to above, Plaintiffs and Defendants entered into other contractual agreements, summarized as follows:

(a) Plaintiffs paid Defendants $7,500 for infographic work,

(b) Plaintiffs paid Defendants $13,988 for a three video project,

(c) Plaintiffs paid Defendants $9,000 for sponsorship of a newsletter Defendants provides to their followers.

The payments total $30,488.

19. Defendants have a contractual obligation to provide the products/services described in the immediately preceding paragraph. Defendants breached the contractual obligations by (a) failing to provide the proposed infographic work in full, (b) only providing one video and Defendants then deleted that video, (c) failing to give Plaintiffs access to the Defendants' newsletter to prove that sponsorship was given to Plaintiffs.

## COUNT III- FRAUD BY WILLFUL AND MALICIOUS ACTS

20. The averments above are incorporated herein by reference.

21. Defendants obtained payment of $90,000 by fraudulently stating that Defendants would provide advertising or a refund in return for the $90,000. The fact that Defendants received $90,000

and failed to provide **any advertising** or a refund is evidence that the statement to provide advertising was fraudulent.

22. Plaintiff ERIC RITTER is a member of Plaintiff SPIROCHAETE RESEARCH LABS, LLC. He produces products to be used by home consumers to test for the presence of lead on surfaces of household items including paint.

23. Beginning in the year 2019, SPIROCHAETE RESEARCH LABS, LLC has produced lead testing swabs.

24. Defendants hold themselves out as consumer advocates working toward lead poisoning prevention; and Defendants held themselves to be a leading independent "expert" in the field of lead poisoning prevention advocacy. Defendants say they are experts in the field of identification of sources of lead capable of producing lead poisoning or leading to higher than incidental lead exposure to people including children.

25. Defendant TAMARA RUBIN said her sons were both poisoned by lead from vapors of lead based paint at her place of residence. RUBIN purports to be a completely self-taught activist who discovered the dangers of lead after her children were poisoned. Her children have brain injuries consistent with high Blood Lead Level lead exposure in children. She says her children suffer learning and behavioral disabilities.

26. RUBIN induced RITTER to hire her with stories of misfortune, poverty, loss, while maintaining that she could improve RITTER's business with product advertisements and promote his goal of selling a new type of lead testing kit. She caused RITTER to "purchase" advertising and consultant services and to pre-pay her for services.

27. Plaintiff RITTER encountered Defendants during an internet research session. Plaintiff hired Defendants for consulting and other work.

28. RUBIN also convinced RITTER to donate to RUBIN updated computer equipment, videography and audio recording equipment, under the pretense of collaboration in order to prevent lead poisoning.

29. RITTER never received the promised services and despite demand for the return of the funds has never been reimbursed. Attempts to receive services or refund have proved to be futile.

30. RITTER and RUBIN began a series of communications via text messages, emails, phone calls and Zoom calls beginning March 29, 2023.

31. RITTER expressed admiration for RUBIN and her advocacy work and heard her concerns that lead poisoning prevention was not being done effectively. This motivated RITTER to work with RUBIN in the hopes of discovering a method for detecting lead that could prevent the tragedy that had befallen RUBIN and her family.

32. RUBIN advertised consulting services at the rate of 350.00 per hour on her website TAMARARUBIN.COM/ LEADSAFEMAMA.COM. In an initial meeting RITTER identified himself as the producer of SCITUS KNOW UNDERSTAND lead testing swabs. RUBIN said that RITTER's tests would be inaccurate on materials such as zinc oxide and titanium dioxide, which are both primary constituents of modern paint. RUBIN offered to rework RITTER's Amazon listing so that it would be consistent with her vision and to alter her website to make accurate representations of RITTER's products.

33. On March 30, 2023, RUBIN said to RITTER that she thought that his product was not accurately testing for the presence of lead in household products and began to encourage him to modify his product, his product's packaging and label, and to restrict it to testing for the presence of lead in paint only.

34. RUBIN offered further services of infographic work for a fee of $7,500 to alter the lead test listing being offered by SPIROCHAETE RESEARCH LABS on Amazon.com. She said that her advice would result in changes to RITTER's product that would bring the product in line with RUBIN's standards. RITTER paid RUBIN $7,500 but she did not provide the services promised.

35. RUBIN told RITTER of her advocacy idea of advertising on the New York City subway system to bring attention to the presence of lead in household products such as milk bottles, baby bottles, drinking glasses, dinnerware and drive viewers to her website. RITTER expressed admiration and a desire to support her advocacy stance. She said she needed $80,0000.00 to fund an advertisement campaign that would be part of that consumer advocacy program.

36. RUBIN said to RITTER that her advertising and services would increase RITTER'Ss sales traffic. RUBIN said that RUBIN's Company LEAD SAFE MAMA LLC maintained a cash flow that would enable her to provide any rebate that she would be contractually obligated to pay. RITTER relied on those representations when he entered into the Contract with RUBIN. RUBIN also represented that RUBIN would refund $90,000 if RITTER in his judgment determined that RITTER's product did not meet RUBIN's standards.

37. Moreover, RUBIN convinced RITTER to make additional payments not covered by Contract as set forth in Paragraph 17 above.

38. RUBIN also managed to entice RITTER into buying her a new computer allegedly so that she could provide more efficient assistance to him in the development of his product and his advertising.

39. RUBIN continued to prey on RITTER's compassion with frequent references to her lead poisoning children's needs, and which often derailed discussions about business. Moreover, RUBIN went as far as to send RITTER a screenshot of her bank account which was negative and

asked him to send her cash via Zelle in September 2023, which he did. RITTER continued to provide financial assistance to RUBIN by taking her up on offers to promote his original lead test swabs in her newsletter, continuing to believe that LEAD SAFE MAMA LLC and RUBIN would promote RITTER'S products on her website, and continuing to believe that RUBIN and LEAD SAFE MAMA LLC were going to make an earnest effort to fulfill their end of the Contract.

40. Despite the support offered by RITTER both financially and otherwise, RUBIN and LEAD SAFE MAMA LLC did not adhere to the terms of the Contract. RUBIN and LEAD SAFE MAMA LLC stopped communicating with RITTER. RUBIN never declared RITTER's product to be in compliance with RUBIN's standards.

41. RITTER determined that his product would not meet RUBIN's standard and in compliance with the Contract, RITTER demanded the $90,000 refund; and demanded the money back for the other prepaid services.

42. On or about March 14th, 2024, RUBIN attempted to reform the Contract. That did not happen as there was no agreement on the new terms suggested by RUBIN.

43. RUBIN on a private Facebook group controlled by her removed any trace of RITTER's lead poisoning prevention activities during the 2024 calendar year. RUBIN deleted comments about him, she stripped video collaboration evidence from her website, "blocked" people mentioning RITTER's product and RITTER's lead poisoning prevention efforts.

44. The Defendants never provided the advertising banner on their websites and did not remit the refund despite being contractually obligated to do so.

45. Defendants' actions were willful, and malicious acts intended to harm Plaintiffs' business and reputation.

46. After receiving payments, Defendants:

- failed to perform the agreed-upon advertising services,

- retained funds with no intent to refund them despite written contractual obligations,

- actively removed and deleted references to Plaintiff and Plaintiff's products from their website and social media,

- blocked and suppressed public comments about Plaintiffs and their lead test kits,

- and knowingly promoted competitors in violation of exclusivity clauses.

47. These actions were intentional and carried out with full knowledge that they would cause financial harm to Plaintiffs and damage their reputation and customer acquisition efforts.

48. Defendants' conduct was motivated by personal animus, retaliation, and a conscious disregard for Plaintiffs' rights, and was designed to erase Plaintiffs' business presence and redirect market opportunities elsewhere.

49. As a result of Defendants' willful and malicious conduct, Plaintiffs suffered substantial financial loss, reputational damage, and missed business opportunities.

50. The elements of fraud are met because, as demonstrated above, Defendants (1) made material misrepresentations of facts and omission of fact, (2) with knowledge of the falsity, (3) with intent to defraud; (4) with reasonable reliance by Plaintiffs; and (5) resulting damage to the Plaintiffs. The fraud caused Plaintiffs to sustain damages of paying Defendants $90,000 for advertising, $30,488, as set forth in Count II and lost profits.

51. If Defendants seek bankruptcy protection, the debt owed to Plaintiffs is non-dischargeable under 11 U.S.C. § 523(a)(6), as it arises from intentional and malicious injury to Plaintiffs and their property.

52.. Defendants used sympathy, fraud and false promises to obtain $90,000 and other money from Plaintiffs. Defendants knew they would not provide advertising and knew they

9

would not refund the $90,000 despite a legal obligation to do so. The conduct is egregious and punitive damages should be awarded to deter similar behavior in the future. Defendants' conduct was willful and malicious and Defendants' intent was to cause harm to Plaintiffs.

## COUNT IV- IN THE ALTERNATIVE, RELIEF FOR UNJUST ENRICHMENT

53. The averments above are incorporated herein by reference.

54. Defendants were enriched by the payments made by Plaintiffs in anticipation of a service which was never provided in the amount of $90,000.00.

55. Defendants were enriched by the additional resources provided by Plaintiffs in the amount of $30,488, as set forth in Count II.

WHEREFORE, Plaintiffs demand judgment against Defendants in an amount in excess of $120,488 plus lost profits to be proven at trial and other damages asserted above with interest and punitive damages together with the costs and disbursements of this action.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

**SALMON RICCHEZZA SINGER & TURCHI LLP**

BY: */s/WMMullineaux*
William Mark Mullineaux, Esquire
110 East 59th Street, 22nd Floor
New York. NY 10022
Tel: 610-291-3850 (cell)
Email: mmullineaux@srstlaw.com